# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2854-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

S.B.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF
P.A.B., a minor.

_____

Submitted April 16, 2024 – Decided May 7, 2024

Before Judges Gooden Brown and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hunterdon County, Docket No. FG-10-0102-21.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Carol L. Widemon, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Julie B. Colonna, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor (David Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant S.B.[1] appeals from the May 2, 2023, judgment of guardianship entered following a lengthy trial, terminating her parental rights to her son, P.A.B., born December 2016. P.A.B. has mainly been in the care of his maternal grandparents since his removal in 2018, and they are committed to adoption. A.S., P.A.B.'s biological father,[2] voluntarily surrendered his parental rights to the maternal grandparents on October 19, 2022, and is not participating in this appeal.

On appeal, S.B. argues the trial judge erred in concluding that the Division of Child Protection and Permanency (Division) met its burden of proving all

_____

[1] Pursuant to Rule 1:38-3(d)(12), we use initials to protect the confidentiality of the participants in these proceedings.

[2] P.A.B. was first removed from defendant and briefly placed with A.S. from whom he was subsequently removed.

A-2854-22

four prongs of the best interests standard embodied in N.J.S.A. 30:4C-15.1(a), and the termination decision was the direct result of ineffective assistance of her trial counsel. The Law Guardian supported termination during the trial and, on appeal, joins the Division in urging us to reject defendant's arguments and affirm. Having considered defendant's arguments in light of the record and applicable legal principles, we affirm substantially for the reasons expressed in Judge Bernadette DeCastro's comprehensive and well-reasoned written decision.

N.J.S.A. 30:4C-15.1(a) requires the Division to petition for termination of parental rights on the grounds of the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

3

> (4) Termination of parental rights will not do more harm than good.

The Division "bears the burden of proving each of those prongs by clear and convincing evidence." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 606 (2007). The four criteria "are not discrete and separate," but rather "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting G.L., 191 N.J. at 606-07). "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999) (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)).

On June 24, 2021, the Division filed a complaint to terminate defendant's parental rights and obtain guardianship of P.A.B., followed by relative adoption. The complaint stemmed from allegations of S.B.'s parental unfitness revolving around her substance abuse and mental illness that manifested itself in delusions, and resulted in noncompliance with treatment, psychiatric hospitalizations, out-of-state relocations, multiple incarcerations, violent threats to Division staff and others, and missed visits with P.A.B.

During the ten-day guardianship trial conducted on divers dates between February and May 2023, the Division presented detailed records showing defendant's long history of mental health and substance abuse issues and their adverse impact on P.A.B.'s permanency and stability during his early childhood. The Division also produced testimony from three caseworkers chronicling the Division's intermittent involvement with defendant since P.A.B.'s birth and persistent efforts to provide defendant with services to no avail.

Three expert witnesses also testified: (1) Dr. Elizabeth Stillwell, a psychologist, who testified on behalf of the Division; (2) Dr. Karen Wells, a psychologist, who testified for the Law Guardian; and (3) Dr. Jacob Jacoby, a psychiatrist, who testified on behalf of defendant. All three experts agreed that defendant suffered from delusions that she vehemently believed were real. Additionally, the resource parents, who were also P.A.B.'s maternal grandparents, described their loving, supportive, and stable relationship with P.A.B. Finally, the manager at the sober living home in Florida where defendant was residing at the time of trial testified on defendant's behalf, attesting to defendant's sobriety and productivity since entering the home in August 2021.

In a fifty-page written decision, Judge DeCastro delineated the Division's long history of involvement with the family, as well as defendant's past and

A-2854-22

ongoing struggle with mental illness and substance abuse issues. The judge detailed the Division's extensive efforts to provide services to defendant, as well as defendant's frequent "unwillingness to comply." The judge acknowledged defendant's participation in several therapeutic and in-patient rehabilitation programs, but also noted that defendant "did not believe she needed [cognitive behavioral therapy (CBT)]" and "did not believe she suffered from delusions." Nonetheless, the Division caseworker recounted "the Division's vast efforts to explore both CBT and CBTp providers in both New Jersey and Florida," as well as the Division's difficulties finding a provider that would service defendant in Florida.[3]

Regarding visits, the judge pointed out that although, initially, visits with P.A.B. were "appropriate," visitation was suspended in 2019 after defendant failed to comply with psychiatric emergency screening services (PESS) to determine whether she was a danger to herself, her son, or others. Subsequently, P.A.B.'s psychologist would not endorse visitation. Critically, the judge

_____

[3] CBT, as defined by Stillwell, is "an evidence-based treatment that focuses on identifying . . . maladaptive thoughts and providing a client with coping skills to address those thoughts." CBTp is a "specific form of [CBT]" that "address[es] a client's delusions . . . [or] psychotic thought processes" with the goal of eliminating the delusions.

A-2854-22

observed that ultimately, defendant was involuntarily committed for about a month in 2019 and hospitalized at Jersey Shore University Medical Center (the Medical Center).

The judge commented that after defendant was discharged from the Medical Center, she reported that while she was hospitalized, she was gang raped by the MS-13 gang. Following her discharge, defendant moved out of state because she believed MS-13 gang members were "after her." Initially, defendant relocated to South Carolina, where she was incarcerated for about six months on theft-related charges, and then to Florida, where she was again incarcerated for about four months. After her release from custody, defendant remained in Florida in a recovery program in a sober living home.

The judge recounted testimony from each of the three expert witnesses. Dr. Stillwell testified that during her psychological evaluation of defendant on May 3, 2022, defendant "exhibited paranoid and persecutory traits," suggesting a diagnosis of "schizoaffective disorder." During the evaluation, defendant told Stillwell "she fled New Jersey because [the] MS[-]13 [gang] was after her." Defendant also told Stillwell that she was "kidnapped," "sexually assaulted," and "held against her will" at the Medical Center "until she called Senator Robert Menendez who forced the hospital [to] release her."

A-2854-22

According to Stillwell, although defendant "believe[d] she [was] being actively pursued by a gang, she assert[ed] that her son would be safe in her custody" in Florida and, if necessary, she would "flee again" to protect them both. Stillwell opined that defendant "present[ed] with persistent delusional beliefs that [were] significantly impairing her ability to parent her son safely and adequately." Although Stillwell believed defendant's "prognosis for change [was] poor," she recommended CBT therapy, noting that defendant would have to "acknowledge that she need[ed] it and comply with it" to benefit from the treatment.

The judge also related testimony from Dr. Wells, whom the judge found "to be the most logical, credible, and persuasive of all the experts." Wells evaluated defendant on August 18, 2022, and "diagnosed [defendant] with schizoaffective [d]isorder, [r]ule-out [p]aranoid [p]ersonality [d]isorder," and "stimulant and cannabis use disorders." Wells explained that "[t]he schizoaffective disorder [diagnosis was] based upon [defendant's] mood instability with the presence of delusions" and "the rule-out paranoid personality disorder [was] based upon the fact that her paranoia began after the birth of her son, and . . . only involves her son's care." Throughout her evaluation, defendant reiterated to Wells that she believed many people, including her family

members, P.A.B.'s daycare staff, her prior attorney, the chief attorney, the police, and various medical staff, were conspiring with MS-13 to kill her, and that she was kidnapped and raped in the basement of the hospital.

Wells opined that because of defendant's delusions, "[t]reatment [would be] very difficult," as "[m]edication would only address manic episodes[, and] not the delusions." Wells noted further that "CBT . . . does not have a high efficacy rate with patients suffering from schizoaffective disorder because when challenged by a therapist, the patient often sees the therapist as part of the conspiracy." Wells acknowledged that defendant has "demonstrated the capacity to remain abstinent in a sober living environment, [was] employed, and . . . has a supportive network in Florida." Nonetheless, according to Wells, defendant "persists in her belief that she was the victim of acts of violence," and "cannot trust the police, the court system, or members of her family."

As a result, Wells opined that "placing the child in [defendant's] care would be emotionally and psychologically damaging to the child" because "[defendant's] ability to nurture and recognize danger would be impacted by her delusions that people in his life are not good for him." Wells believed defendant's "delusions [were] of grave concern" because defendant "believe[d] that people [were] out to get her in the absence of any proof," and "[h]er distrust

9

of doctors, relatives and school employees would affect the child." According to Wells, defendant "lack[ed] the capacity to understand her child's well[-]being and meet his needs" as evidenced by the fact that defendant "does not understand that severing relationships with prior caregivers" as she intended to do "would be detrimental to the child."

Additionally, the judge detailed Dr. Jacoby's testimony. Jacoby diagnosed defendant with "adjustment disorder and polysubstance use disorder in remission." Jacoby believed that defendant's delusions were "the result of prior use of methamphetamines" and "described the wiring in her head as 'frayed' from drug use." Jacoby opined that despite defendant's belief that "the delusions [were] real," based upon "her overall performance since she has been sober," she can "parent a child" if "she can remain substance free." However, Jacoby was "unable to predict how long it would take for the delusions to subside," and "agreed that the delusions would affect her ability to parent." To support his opinion, Jacoby pointed out that "since [defendant] has become abstinent," her "[p]sychosis[] has vastly improved" and she has been "socially productive," "employed," and "attending school." Nevertheless, Jacoby recommended that for defendant to get to the point where she could safely parent a child, she needed

A-2854-22

to "remain in a controlled environment under the care of a psychiatrist[,] . . . engage in cognitive therapy," and take her "medication."

The judge explained that the "Division explored relatives for placement of the child[,] including the paternal grandparents and the maternal grandparents," who had been primarily caring for P.A.B. since 2018 and wished to adopt him. The maternal grandparents, consisting of defendant's biological father and stepmother, testified that "they fully underst[ood] the differences" between Kinship Legal Guardianship (KLG) and adoption, and that they both wanted to adopt P.A.B. In particular, defendant's father testified that he initially agreed to KLG, but changed his mind after P.A.B.'s father entered an identified surrender. Although he intended to allow P.A.B. to see his father with proper supervision, he believed defendant currently presented a danger to P.A.B. because, in the past, she had threatened to kill herself and P.A.B.

Next, the judge applied the statutory "best interests" standard and concluded that "the Division ha[d] proven by clear and convincing evidence that the best interests of [P.A.B.] require that . . . defendant's parental rights should be terminated." Under prong one, the judge found that although P.A.B. "ha[d] not suffered actual harm at the hands of his mother," defendant "presents a substantial risk of harm to the child because of her untreated mental illness and

11

her delusions which manifest around her son."  The judge stressed that despite clear evidence to the contrary, "[d]efendant denies that she needs mental health treatment" and "denies that she has delusions."

The judge found that both Dr. Stillwell's and Dr. Wells's testimony supported the conclusion that defendant's

> mental illness preclude[s] her from safely parenting her son.  There is no doubt that [defendant] loves her son and would not deliberately harm him.  However, [P.A.B.] has already suffered harm because he has spent over two years in the Division's custody, and he was removed twice from a parent.  He has no relationship with his mother and sadly does not have any contact with her even though he is with maternal relatives.  [Defendant] is unable to provide a safe and stable home for the child now or in the foreseeable future.

As to prong two, the judge found that "all experts[,] including Dr. Jacoby[,] agree that at this time [defendant] is unable to parent her son nor is it feasible that she will be able to do so in the foreseeable future."  The judge observed

> [defendant] does not believe that she needs treatment.  She has no insight into her mental illness.  She continues to endorse the delusion that MS[-]13 with the help of others close to her are part of the conspiracy.  She believes that she was gang raped by MS[-]13 with the assistance of her prior attorneys and the police.  Without extensive treatment, it is unlikely that she will change in the foreseeable future.

12

Citing <u>New Jersey Division of Youth and Family Services v. B.G.S.</u>, 291 N.J. Super. 582, 592 (App. Div. 1996), the judge explained that

> where a parent is unable to care for a child for a prolonged period due to certain circumstances such as mental illness and they would not be able to take custody for an indefinite period of time, it is against the child's best interest to prolong resolution of his status by indefinitely extending foster care placement.

For prong three, the judge recognized that the "Division referred [defendant] to a myriad of services." The judge recounted some of the extensive services provided and detailed the Division's efforts to continue services, despite defendant's refusal and relocation out-of-state. The judge also explained the circumstances under which visits with P.A.B. were suspended. Additionally, the judge noted that "there [were] no alternatives to termination," as the maternal grandparents currently "want nothing to do with [defendant] and are unwilling to do KLG," and other "[r]elatives were explored . . . and ruled out." The judge was satisfied that the maternal grandparents' decision to pursue adoption, instead of KLG, was "informed, unconditional, and unequivocal."

Finally, as to prong four, the judge referred to the bonding evaluation between P.A.B. and the maternal grandparents conducted by Dr. Wells, after which Wells "opined that there [was] a mutually intact and secure child-parent

bond between them." According to the judge, Wells observed that the maternal grandparents were "child-focused, attentive, and lovingly engaged with [P.A.B.] during the bonding evaluation." Further, Wells explained that "throughout the child's life," the maternal grandparents acted as his "psychological parents," attending "to [h]is physical, educational, familial, emotional, and psychological needs," "prioritiz[ing] his well-being," and "provid[ing] him with stability, guidance, and protection that every child needs and deserves."

In stark contrast, the judge noted that "no bonding occurred with [defendant] because she has had no contact with [P.A.B.] since 2019." The judge explained:

> [Defendant] contributed to this estrangement from her son by refusing to engage in a [PESS] exam and comply with mental health services. Moreover, she left New Jersey making supervised visitation near impossible.
>
> Here, the Division has shown by clear and convincing evidence that the child will not suffer any harm if separated from [defendant] with whom the child has no relationship and has not seen in almost three years.

The judge entered a memorializing order and this appeal followed.

On appeal, defendant raises the following points for our consideration:

POINT I

14

THE JUDGMENT TERMINATING [DEFENDANT'S] PARENTAL RIGHTS SHOULD BE VACATED BECAUSE THE TRIAL COURT ERRED IN REACHING ITS LEGAL CONCLUSION THAT [THE DIVISION] MET ITS BURDEN OF PROVING THE FIRST THREE PRONGS OF THE BEST INTERESTS TEST AS ANY ALLEGED RISK OF HARM UNDER PRONGS ONE AND TWO RESULTED FROM DCPP'S FAILURE UNDER PRONG THREE TO TIMELY IMPLEMENT SERVICES RECOMMENDED BY TWO OF ITS PSYCHOLOGISTS.

POINT II

THE TRIAL COURT'S FINDING OF HARM UNDER PRONG ONE FROM THE ABSENCE OF A PARENT-CHILD RELATIONSHIP SHOULD NOT BE ALLOWED TO STAND AS ANY ALLEGED HARM RESULTED FROM THE TRIAL COURT'S IMPROPER DENIAL OF VISITATION.

POINT III

THIS COURT SHOULD REVERSE THE TRIAL COURT'S DETERMINATION THAT [THE DIVISION] MET ITS BURDEN OF PROVING PRONG THREE OF THE BEST INTERESTS TEST AS [THE DIVISION'S] MALFEASANCE IN FAILING TO DISCLOSE TO THE TRIAL COURT MATERIAL FACTS REGARDING [P.A.B.'S] DESIRE FOR CONTACT WITH HIS MOTHER DIRECTLY CONTRAVENED BOTH A COURT ORDER AND [THE DIVISION'S] MANDATE UNDER PRONG THREE TO EXERCISE REASONABLE EFFORTS TO FACILITATE VISITATION.

POINT IV

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN CONCLUDING THAT [THE DIVISION] MET ITS BURDEN UNDER PRONG FOUR OF THE BEST INTERESTS TEST REQUIRING PROOF BY CLEAR AND CONVINCING EVIDENCE THAT TERMINATION OF [DEFENDANT'S] PARENTAL RIGHTS WILL NOT DO MORE HARM THAN GOOD.

POINT V

BECAUSE THE UNJUST DECISION TERMINATING [DEFENDANT'S] PARENTAL RIGHTS WAS THE DIRECT RESULT OF THE INEFFECTIVE ASSISTANCE OF HER TRIAL COUNSEL, THIS COURT SHOULD VACATE THE JUDGMENT ENTERED AGAINST HER AND REMAND THIS MATTER FOR A NEW TRIAL TO INCLUDE DOCUMENTARY AND TESTIMONIAL EVIDENCE OMITTED BY TRIAL COUNSEL TO THE DETRIMENT OF [DEFENDANT'S] CASE.

Focusing first on Points I through IV, our scope of review on appeals from orders terminating parental rights is limited. N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 379 (App. Div. 2018). In such cases, we will generally uphold the trial court's factual findings, so long as they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). Indeed, we must give substantial

deference to Family Part judges' special expertise and opportunity to have observed the witnesses firsthand and evaluate their credibility. Id. at 552-53. Thus, a termination decision should only be reversed or altered on appeal if the trial court's findings are "'so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

Even where the parent alleges "'error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,'" deference must be accorded unless the judge "'went so wide of the mark that a mistake must have been made.'" N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 189 (App. Div. 1993); and then quoting C.B. Snyder Realty Inc. v. BMW of N. Am. Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." R.G., 217 N.J. at 552-53 (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Guided by these standards, we are satisfied that the judge's factual findings are amply supported by the credible evidence in the record, and her

legal conclusions are sound. On appeal, defendant challenges the judge's findings on all four prongs of the best interests standard, arguing the Division's failure to meet its prong three obligation "to exercise reasonable efforts" informed the judge's determination on the remaining prongs. In particular, defendant claims the Division's failure to implement its own psychologists' recommendation for CBTp therapy as well as the improper suspension of visitation with P.A.B., who expressed a desire for a virtual visit, were "entirely unreasonable" and "created the grounds" for the judge's termination decision.

On the contrary, there is ample evidence in the record to support the judge's termination decision. See In re Guardianship of DMH, 161 N.J. 365, 393 (1999) ("The diligence of [the Division's] efforts on behalf of a parent is not measured by their success[,]" but "must be assessed against the standard of adequacy in light of all the circumstances of a given case"); N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007) ("Even if the Division had been deficient in the services offered to [the parent], reversal would still not be warranted, because the best interests of the child controls."). "It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to

support the decision to terminate parental rights." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012).

Moreover, as public policy increasingly focuses on a child's need for permanency, it has resulted in the placement of "limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). To that end, the emphasis has "shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being." Ibid. (citing N.J.S.A. 30:4C-11.1). That is because "[a] child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." Ibid. The question then is "whether the parent can become fit in time to meet the needs of the child[]." N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 263 (App. Div. 2005); see also P.P., 180 N.J. at 512 (observing that even if a parent is trying to change, a child cannot wait indefinitely); B.G.S., 291 N.J. Super. at 593 (holding that the "termination action was not predicated upon bonding, but rather reflected [the child's] need for permanency and [the defendant's] inability to care for him in the foreseeable future").

Here, the judge carefully reviewed the evidence presented at trial, made copious findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded that the Division met, by clear and convincing evidence, all of the legal requirements for a judgment of guardianship. The judge reasonably determined that defendant was unable to parent P.A.B., would not be able to do so for the foreseeable future, and any further delay of permanent placement would not be in the child's best interests. The judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a) and comports with applicable case law. See, e.g., F.M., 211 N.J. at 447-54; E.P., 196 N.J. at 102-11; K.H.O., 161 N.J. at 347-63; DMH, 161 N.J. at 375-93; N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 604-11 (1986).

Equally baseless is S.B.'s contention in Point V that she received ineffective assistance of counsel (IAC). To establish IAC, defendant "must meet the two-prong test established in Strickland v. Washington, 466 U.S. 668, 687 (1984), and adopted by our Supreme Court for [IAC] claims asserted in matters involving the termination of parental rights [in New Jersey Division of Youth & Family Services v. B.R., 192 N.J. 301, 308-09 (2007)]." N.J. Div. of Child Prot. & Permanency v. P.D., 452 N.J. Super. 98, 116 (App. Div. 2017). To meet the test,

A-2854-22

(1) counsel's performance must be objectively deficient—i.e., it must fall outside the broad range of professionally acceptable performance; and (2) counsel's deficient performance must prejudice the defense—i.e., there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

[B.R., 192 N.J. at 307 (quoting Strickland, 466 U.S. at 694).]

Unlike criminal cases, the B.R. Court "direct[ed] that claims of [IAC] in termination cases be raised on direct appeal" given "'the need to stabilize the circumstances of the child.'" Id. at 310-11 (quoting Susan Calkins, Ineffective Assistance of Counsel in Parental-Rights Termination Cases: The Challenge for Appellate Courts, 6 J. App. Prac. & Process 179, 207 (2004)). The Court noted:

In many cases, the issue will be resolvable on the appeal record alone. For example, if the panel accepts as true appellant's representations regarding the lawyer's shortcomings but determines, on the basis of the full record, that the outcome would not have changed, that will be the end of it.

[Id. at 311.]

Such is the case here. Defendant predicates her IAC claims on her attorney's failure to produce "seven fact witnesses to testify regarding [defendant's] present abilities and accomplishments in life" as well as two police reports showing "no signs of drug use" or neglect by defendant during a child

21

welfare check in the days prior to P.A.B.'s removal. One of the police reports was, in fact, introduced at trial. Nonetheless, even accepting as true defendant's claims regarding her attorney's shortcomings, based on the overwhelming evidence supporting the judge's decision to terminate defendant's parental rights, the outcome would not have been different without the purported deficiencies. Thus, because defendant cannot establish the prejudice prong, her IAC claim fails.

To the extent we have not specifically addressed a particular argument, we deem it without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22

A-2854-22